UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION at LONDON

CIVIL ACTION NO. 09-229-GWU

MICHAEL DYER, PLAINTIFF,

VS. **MEMORANDUM OPINION**

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY, DEFENDANT.

## INTRODUCTION

The plaintiff brought this action to obtain judicial review of an administrative denial of his application for Disability Insurance Benefits (DIB). The appeal is currently before the court on cross-motions for summary judgment.

## APPLICABLE LAW

The Commissioner is required to follow a five-step sequential evaluation process in assessing whether a claimant is disabled.

1. Is the claimant currently engaged in substantial gainful activity? If so, the claimant is not disabled and the claim is denied.

2. If the claimant is not currently engaged in substantial gainful activity, does he have any "severe" impairment or combination of impairments--i.e., any impairments significantly limiting his physical or mental ability to do basic work activities? If not, a finding of non-disability is made and the claim is denied.

3. The third step requires the Commissioner to determine whether the claimant's severe impairment(s) or combination of impairments meets or equals in severity an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the Listing of

Impairments). If so, disability is conclusively presumed and benefits are awarded.

4. At the fourth step the Commissioner must determine whether the claimant retains the residual functional capacity to perform the physical and mental demands of his past relevant work. If so, the claimant is not disabled and the claim is denied. If the plaintiff carries this burden, a prima facie case of disability is established.

5. If the plaintiff has carried his burden of proof through the first four steps, at the fifth step the burden shifts to the Commissioner to show that the claimant can perform any other substantial gainful activity which exists in the national economy, considering his residual functional capacity, age, education, and past work experience.

20 C.F.R. §§ 404.1520; 416.920; Garner v. Heckler, 745 F.2d 383, 387 (6th Cir. 1984); Walters v. Commissioner of Social Security, 127 F.3d 525, 531 (6th Cir. 1997).

Review of the Commissioner's decision is limited in scope to determining whether the findings of fact made are supported by substantial evidence. Jones v. Secretary of Health and Human Services, 945 F.2d 1365, 1368-1369 (6th Cir. 1991). This "substantial evidence" is "such evidence as a reasonable mind shall accept as adequate to support a conclusion;" it is based on the record as a whole and must take into account whatever in the record fairly detracts from its weight. Garner, 745 F.2d at 387.

One of the issues with the administrative decision may be the fact that the Commissioner has improperly failed to accord greater weight to a treating physician

than to a doctor to whom the plaintiff was sent for the purpose of gathering information against his disability claim. Bowie v. Secretary, 679 F.2d 654, 656 (6th Cir. 1982). This presumes, of course, that the treating physician's opinion is based on objective medical findings. Cf. Houston v. Secretary of Health and Human Services, 736 F.2d 365, 367 (6th Cir. 1984); King v. Heckler, 742 F.2d 968, 973 (6th Cir. 1984). Opinions of disability from a treating physician are binding on the trier of fact only if they are not contradicted by substantial evidence to the contrary. Hardaway v. Secretary, 823 F.2d 922 (6th Cir. 1987). These have long been well-settled principles within the Circuit. Jones, 945 F.2d at 1370.

Another point to keep in mind is the standard by which the Commissioner may assess allegations of pain. Consideration should be given to all the plaintiff's symptoms including pain, and the extent to which signs and findings confirm these symptoms. 20 C.F.R. § 404.1529 (1991). However, in evaluating a claimant's allegations of disabling pain:

> First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

Duncan v. Secretary of Health and Human Services, 801 F.2d 847, 853 (6th Cir. 1986).

Another issue concerns the effect of proof that an impairment may be remedied by treatment. The Sixth Circuit has held that such an impairment will not serve as a basis for the ultimate finding of disability. Harris v. Secretary of Health and Human Services, 756 F.2d 431, 436 n.2 (6th Cir. 1984). However, the same result does not follow if the record is devoid of any evidence that the plaintiff would have regained his residual capacity for work if he had followed his doctor's instructions to do something or if the instructions were merely recommendations. Id. Accord, Johnson v. Secretary of Health and Human Services, 794 F.2d 1106, 1113 (6th Cir. 1986).

In reviewing the record, the court must work with the medical evidence before it, despite the plaintiff's claims that he was unable to afford extensive medical work-ups. Gooch v. Secretary of Health and Human Services, 833 F.2d 589, 592 (6th Cir. 1987). Further, a failure to seek treatment for a period of time may be a factor to be considered against the plaintiff, Hale v. Secretary of Health and Human Services, 816 F.2d 1078, 1082 (6th Cir. 1987), unless a claimant simply has no way to afford or obtain treatment to remedy his condition, McKnight v. Sullivan, 927 F.2d 241, 242 (6th Cir. 1990).

Additional information concerning the specific steps in the test is in order.

Step four refers to the ability to return to one's past relevant category of work. Studaway v. Secretary, 815 F.2d 1074, 1076 (6th Cir. 1987). The plaintiff is said to

make out a prima facie case by proving that he or she is unable to return to work. Cf. Lashley v. Secretary of Health and Human Services, 708 F.2d 1048, 1053 (6th Cir. 1983). However, both 20 C.F.R. § 416.965(a) and 20 C.F.R. § 404.1563 provide that an individual with only off-and-on work experience is considered to have had no work experience at all. Thus, jobs held for only a brief tenure may not form the basis of the Commissioner's decision that the plaintiff has not made out its case. Id. at 1053.

Once the case is made, however, if the Commissioner has failed to properly prove that there is work in the national economy which the plaintiff can perform, then an award of benefits may, under certain circumstances, be had. E.g., Faucher v. Secretary of Health and Human Services, 17 F.3d 171 (6th Cir. 1994). One of the ways for the Commissioner to perform this task is through the use of the medical vocational guidelines which appear at 20 C.F.R. Part 404, Subpart P, Appendix 2 and analyze factors such as residual functional capacity, age, education and work experience.

One of the residual functional capacity levels used in the guidelines, called "light" level work, involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds; a job is listed in this category if it encompasses a great deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls; by definition,

a person capable of this level of activity must have the ability to do substantially all these activities. 20 C.F.R. § 404.1567(b). "Sedentary work" is defined as having the capacity to lift no more than ten pounds at a time and occasionally lift or carry small articles and an occasional amount of walking and standing. 20 C.F.R. § 404.1567(a), 416.967(a).

However, when a claimant suffers from an impairment "that significantly diminishes his capacity to work, but does not manifest itself as a limitation on strength, for example, where a claimant suffers from a mental illness . . . manipulative restrictions . . . or heightened sensitivity to environmental contaminants . . . rote application of the grid [guidelines] is inappropriate . . ." Abbott v. Sullivan, 905 F.2d 918, 926 (6th Cir. 1990). If this non-exertional impairment is significant, the Commissioner may still use the rules as a framework for decision-making, 20 C.F.R. Part 404, Subpart P, Appendix 2, Rule 200.00(e); however, merely using the term "framework" in the text of the decision is insufficient, if a fair reading of the record reveals that the agency relied entirely on the grid. Ibid. In such cases, the agency may be required to consult a vocational specialist. Damron v. Secretary, 778 F.2d 279, 282 (6th Cir. 1985). Even then, substantial evidence to support the Commissioner's decision may be produced through reliance on this expert testimony only if the hypothetical question given to the expert

accurately portrays the plaintiff's physical and mental impairments. Varley v. Secretary of Health and Human Services, 820 F.2d 777 (6th Cir. 1987).

**DISCUSSION**

The plaintiff, Michael Dyer, was found by an Administrative Law Judge (ALJ) to have "severe" impairments consisting of a history of low back pain and anxiety disorder without agoraphobia. (Tr. 14). Nevertheless, based in part on the testimony of a Vocational Expert (VE), the ALJ determined that Mr. Dyer retained the residual functional capacity to perform his past relevant work, and accordingly was not entitled to benefits. (Tr. 18-21). The Appeals Council declined to review, and this action followed.

At the administrative hearing, the ALJ asked the VE whether the plaintiff, a 51-year-old man with an eighth grade education, could perform any jobs if he were capable of "medium" level exertion, and also had the following non-exertional restrictions. He: (1) required no more than simple instructions in an object-focused work environment; (2) could occasionally interact with coworkers and supervisors; (3) could not interact with the general public; (4) could adapt to stress in a not highly pressured work setting; (5) was not capable of production rate or quota work; (6) had moderate limitations in his ability to perform detailed instructions and in his ability to work in coordination with and in proximity to others without being distracted by them; and (7) was moderately limited in his ability to complete eight hours of

work without being distracted by psychologically-based symptoms. (Tr. 50-1). The VE responded that with those restrictions, the plaintiff would be capable of performing his past relevant work as a security guard. (Tr. 51). In the alternative, he identified other jobs that the claimant could perform, and proceeded to give the numbers in which the occupations existed in the state and national economies. (Tr. 51-2).

On appeal, this court must determine whether the hypothetical factors selected by the ALJ are supported by substantial evidence, and that they fairly depict the plaintiff's condition.

Mr. Dyer alleged disability due to agoraphobia. (Tr. 100). He testified that he had suffered from panic attacks since the age of 15 and had quit school after the eighth grade for that reason. (Tr. 27). When he was younger he had tried to "self-medicate" by drinking, but he had stopped drinking in approximately 1980 or 1982. (Tr. 43, 45). He had initially worked for his father after leaving school, who allowed him to stay at home when he had panic attacks. (Tr. 39). He had worked for several years as a service station attendant until the station was sold, and then had worked nine years as an unarmed security guard. (Tr. 28-9). He resigned because he felt overwhelmed by anxiety and could not perform his job. (Tr. 29). He had seen a psychiatrist, Dr. Briscoe, many years earlier and had been on medication, but stopped because he was "doing pretty good" and could get his prescriptions

from his family doctor. (Tr. 41, 47). When his problems worsened again, Dr. Briscoe was not accepting new patients, and he had sought treatment initially at the Adanta Mental Health Clinic and subsequently from a psychiatrist, Dr. Umar. (Tr. 48).

Mr. Dyer testified that he felt that his home was his only safe place and was the only place he could relax. (Tr. 28). He stated he had difficulty going shopping or eating in a restaurant, and would have to leave. (Tr. 33, 42). He was currently on the medications Elavil and Klonopin from Dr. Umar, but the only difference he could detect was sleeping better at night. There was no change in his panic attacks. (Tr. 34). He testified that he had tried going hunting across the road from his house two times but had had to come home both times because he felt anxious and miserable being away from home. (Tr. 30).

Physically, Mr. Dyer described low back pain, with numbness in his left leg and hip. (Tr. 35-6). He could hurt his back by picking up as little as 20 pounds, and could hardly "get up and down" when the problem flared up. (Tr. 36). His chiropractor had described his problem as a pinched nerve, but he did not have money for additional treatments or studies. (Tr. 35). He took Ibuprofen for his back pain, or aspirin, but it was not necessary every day. (Tr. 38).

Remote records from Dr. C. William Briscoe show that he had treated Mr. Dyer for intense nervous spells beginning in 1981 (Tr. 176) but by 1994 and 1995

he was doing very well and in 1996, Dr. Briscoe approved his receiving medication from his family physician. (Tr. 156, 159).

Apparently, Mr. Dyer did not seek mental health treatment again until an initial visit to Adanta in April, 2006. (Tr. 225). He described having a panic disorder. On being interviewed by the staff psychiatrist, Dr. Alan Myers, on June 7, 2006, the plaintiff related that he had last worked in February, 2006, and was applying for disability. (Tr. 217). He gave his history of panic attacks and "agoraphobic symptoms," and history of treatment by Dr. Briscoe. (Tr. 218). Dr. Myers described Mr. Dyer as appearing anxious with fair insight and judgment, and diagnosed a panic disorder with agoraphobia along with a history of alcohol dependence in complete remission for 26 years by his report. (Tr. 219-20). Dr. Myers assigned a Global Assessment of Functioning (GAF) score of 50. A GAF score of 50 reflects "serious symptoms . . . or any serious impairment in social, occupational, or school functioning." Diagnostic and Statistical Manual of Mental Disorders (4th Ed.--Text Revision) (DSM-IV-TR), p. 34. He prescribed the medication Lexapro and recommended psychotherapy. (Tr. 220). However, an Adanta staff member later reported that Mr. Dyer rescheduled one doctor's appointment, failed to appear at a therapy appointment, and canceled a further doctor's appointment without rescheduling. (Tr. 255). This report was apparently reviewed and signed by Dr. Myers. (Id.).

Mr. Dyer began treatment with Dr. Syed Umar on October 30, 2006. He described feelings of fear of being away from home, anxiety, and panic attacks, which had been getting worse for two or three years. (Tr. 290). At one point he had gone to the emergency room for what he thought was a heart attack, but the work-up had been negative. (Id.). His activities of daily living were limited because he could not go out. He had discontinued Lexapro because of sexual dysfunction. (Tr. 291). Dr. Umar described Mr. Dyer as being cooperative, nervous, and with satisfactory attention and concentration. His insight and judgment were intact. (Tr. 292). He diagnosed a panic disorder without agoraphobia and also assigned a GAF of 50. (Id.). He prescribed Elavil and described relaxation techniques. After apparently missing several appointments, Mr. Dyer continued treatment with Dr. Umar from August through December, 2007. During this time, the psychiatrist continued his diagnosis, but assigned a GAF of 55, reflective of moderate symptoms or moderate difficulty in social, occupational, or school functioning according to the DSM-IV-TR. (Tr. 288-9, 294-5). Trials of the medications Ativan and Xanax were reportedly ineffective, so Dr. Umar prescribed Klonopin in addition to the Elavil. (Tr. 294-5). He described the plaintiff's mood as nervous and his affect as anxious. (Tr. 295).

On December 19, 2007, Dr. Umar completed a mental residual functional capacity questionnaire indicating that Mr. Dyer had "extreme" restrictions on his

ability to deal with the public, maintain attention and concentration, understand, remember, and carry out complex job instructions, behave in an emotionally stable manner, complete a workday and workweek without interruptions from psychologically-based symptoms, and tolerate ordinary stresses associated with daily work activity. (Tr. 297-9). He reported that the plaintiff would have "marked" restrictions with his ability to follow work rules, interact appropriately with supervisors and coworkers, respond appropriately to criticism from supervisors, perform routine tasks at a consistent and appropriate pace without special supervision, understand, remember, and carry out detailed and simple job instructions, maintain personal appearance, and demonstrate reliability. (Id.).

Shortly before resuming treatment with Dr. Umar, Mr. Dyer underwent a consultative psychological evaluation by Jessica Huett, Psy.D., a temporary licensed psychologist, under the supervision of Licensed Clinical Psychologist Christopher Catt. Mr. Dyer gave his history of agoraphobia and having difficulty being around people. (Tr. 277).[1] He stated that he could manage self-care tasks adequately and he would attempt household chores but did little else other than lying around and watching television. (Tr. 278). His wife would manage the bills and shop. (Id.). Dr. Huett described variable concentration and distractible

[1]He indicated that he had been seeing a psychiatrist previously but could not afford it, and was currently out of medication. (Tr. 278).

attention, noting that anxiety and pain appeared to interfere. (Tr. 279). Mr. Dyer's facial expression was tense, his affect was restricted, and his mood was pessimistic. (Id.). The psychologist diagnosed a panic disorder with agoraphobia, recurrent moderate major depressive disorder, and alcohol dependence in full sustained remission by report. (Tr. 280). In the body of the report, Dr. Huett opined that Mr. Dyer would have a "marked" limitation in his ability to sustain attention and concentration towards the performance of simple and repetitive tasks, a moderate to marked limitation in his ability to tolerate the stress and pressure of day-to-day employment and respond appropriately to supervision, coworkers, and work pressures in a work setting, and a moderate limitation in his ability to understand, remember, and carry out instructions towards the performance of simple, repetitive tasks. (Id.). In a separate mental medical assessment form completed on August 3, 2007, Drs. Huett and Catt checked boxes indicating that Mr. Dyer would have a "seriously limited but not precluded" ability to relate to coworkers, deal with the public, deal with work stresses, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability. He would also have a "limited but satisfactory" ability to use judgment, interact with supervisors, and function independently. (Tr. 282-3).

The only other evidence from mental health sources discussing the plaintiff's mental condition were reports from non-examining state agency psychologists Jan

Jacobson and Ilze Sillers, who reviewed the evidence on July 26, 2006 and October 26, 2006, respectively. They agreed that Mr. Dyer had a moderately limited ability to understand, remember, and carry out detailed instructions, work in coordination or proximity to others without being distracted by them, complete a normal work day and work week without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, and respond appropriately to changes in the work setting. (Tr. 249-50, 256-7). Dr. Jacobson commented that Mr. Dyers's mental allegations were partially credible. He had been able to work for many years with his anxiety problems but she felt that the mental status evaluation (presumably a reference to the Adanta notes, which were the only mental status notes then available) and his activities of daily living did not indicate marked mental limitations. (Tr. 251). For instance, she noted that he could do some things outside the home such as shopping and paying bills. She concluded that Mr. Dyer was able to understand and remember simple instructions, sustain attention for simple tasks for two-hour segments in an eight-hour day, interact with coworkers and supervisors in a non-public setting in which interactions were limited, brief, and task-focused, and adapt to stress in a work setting which was not highly pressured. (Id.). Dr. Sillers stated that she agreed with this assessment. (Tr. 258).

The hypothetical factors are generally consistent with the restrictions imposed by Drs. Jacobson and Sillers, to whom the ALJ accorded great weight. (Tr. 21).

The ALJ stated that he gave great weight to Dr. Umar's longitudinal treatment notes and GAF score of 55. (Tr. 16-17). He asserted that the "marked" to "extreme" limitations in the medical source statement were contradicted by the physician's decision to discontinue Xanax "which suggests a decrease in the severity of his symptoms." (Tr. 16). However, as previously noted, the physician had replaced Xanax with Klonopin on the same office visit. (Tr. 294). The ALJ was also critical of Dr. Umar for "essentially repeat[ing] what he had been told by the claimant," and for listing restrictions that were inconsistent with a GAF of 55. (Id.). The consulting examiner, Dr. Huett, was discounted due to what the ALJ felt were minimal clinical findings and statements in a form earlier filled out by the plaintiff's wife that he could perform household chores, read, watch television, pay bills, shop, and drive. (Tr. 16). The ALJ felt that the assessment was less credible due to Mr. Dyer's ability to work for the prior ten years, with no particular event that would have caused an exacerbation of his symptoms. The ALJ was critical of the plaintiff for failing to seek treatment until he had been off work for three months, and for being "non-compliant until after his application for benefits was denied." The ALJ unfavorably contrasted the consultant's diagnosis of agoraphobia with Dr. Umar's

long-term finding of no agoraphobia and finding of no insight with Dr. Umar's indication that he did have insight. (Id.). Finally, the ALJ was critical of the diagnosis of a major depressive disorder and an anxiety disorder with agoraphobia in the notes from Adanta, but was apparently under the impression that a counselor had conducted a consultative examination, rather than summarizing his treatment, and that the staff psychiatrist was Dr. Umar, rather than Dr. Myers, and that he had endorsed Baker's evaluation without evidence that he had actually examined the claimant. (Tr. 15-16). Dr. Myers' evaluation notes are in the transcript, however. (Tr. 217-20).

Thus, the ALJ essentially rejected the conclusions of all three examining sources in favor of non-examining reviewers who did not have access to the majority of the treatment notes. Social Security Ruling 96-6p provides that in some circumstances the opinion of non-examining sources can be accepted over the opinion of even a treating source, in situations where the non-examiner has access to the entire case record and clearly expresses a reason for the difference of opinion. See also Barker v. Shalala, 40 F.3d 789, 794 (6th Cir. 1994). That was not the case here. Generally speaking, the opinion of a treating physician is entitled to great weight; if it is not contradicted by other substantial evidence it may be entitled to controlling weight. In the present case, the ALJ purported to rely on his own interpretation of the treating psychiatrist's office notes, while rejecting the treating

psychiatrist's conclusions even though these conclusions were relatively consistent with two other one-time examining sources. As previously noted, one of the grounds cited by the ALJ, the discontinuance of a medication suggesting the improvement in the plaintiff's condition, was erroneous. Another ground, that the psychiatrist had merely repeated what the plaintiff had told him, has been previously criticized by the Sixth Circuit in Blankenship v. Bowen, 874 F.2d 1116, (6th Cir. 1989).[2] It is not clear why the plaintiff's ability to perform minimal daily functions such as household chores, reading, and watching television would be inconsistent with his alleged difficulty in leaving home. See Rogers v. Commissioner of Social Security, 486 F.3d 234, 248 (6th Cir. 2007); 20 C.F.R. § 404.1521(b). As for his ability to pay bills and shop, the plaintiff's wife had stated in a form prepared in April, 2006, 18 months before Dr. Umar reported his restrictions, that he would "occasionally" go alone to the store or pay a bill but he would never do anything that would take longer than 15 minutes, and that most of his time away from home was occupied in travel time to and from the store. (Tr. 114). Regarding the plaintiff's missed psychiatric appointments, the Sixth Circuit has said that "it is a questionable

[2]"In general, mental disorders cannot be ascertained and verified as are most physical illnesses . . . . The report of a psychiatrist should not be rejected simply because of the relative imprecision of the psychiatric methodology or the absence of substantial documentation, unless there are other reasons to question the diagnostic techniques." Poulin v. Bowen, 817 F.2d 865, 873-4 (D.C. Cir. 1987), cited in Blankenship, 874 F.2d at 1121.

practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation." Blankenship, 874 F.2d at 1124. In an unpublished case, the Sixth Circuit has also been critical of the practice of disregarding the conclusions of a treating physician in favor of an ALJ's own interpretation of GAF scores and daily activities. Martin v. Commissioner of Social Security, 61 Fed. Appx. 191, 2003 WL 1870731 (6th Cir. 2003).

While there is a considerable amount of evidence from treating and examining sources consistent with disability, the court concludes that the evidence is not so overwhelming that an immediate award of benefits is mandated. Therefore, a remand will be required to obtain, at a minimum, the opinion of a medical expert with access to the entire record, if the opinion of the treating psychiatrist is to be disregarded.

The decision will be remanded for further consideration.

This the 8th day of March, 2010.




**Signed By:**

***G. Wix Unthank***

**United States Senior Judge**